IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 2, 2015 Session

**STATE OF TENNESSEE v. CARLOS WILSON**

**Appeal from the Criminal Court for Shelby County**
**No. 12-03231     John W. Campbell, Judge**

**No. W2014-01388-CCA-R3-CD  -  Filed September 30, 2015**

A Shelby County jury convicted the Defendant of aggravated sexual battery and especially aggravated sexual exploitation of a minor. The trial court sentenced him to an effective sentence of twenty-one years, to be served at 100%. On appeal, the Defendant contends that: (1) the trial court erred when it required that he be represented by counsel at trial; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court erred when it ordered consecutive sentences. After a thorough review of the record and the applicable authorities, we conclude that there exists no error in the judgments of the trial court. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ. joined.

Andre B. Mathis (on appeal), and J. Jeffrey Lee (at trial), Memphis, Tennessee, for the appellant, Carlos Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Douglas Gregory Gilbert and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from interactions between the Defendant and the child of the Defendant's girlfriend, B.B.[1], who alleged that the Defendant began giving her

---

[1] In order to protect the minor victim's privacy, we will refer to her by her initials only.

inappropriate "massages" when she was eleven. For these interactions, a Shelby County grand jury indicted the Defendant for aggravated sexual battery and especially aggravated sexual exploitation of a minor.

## A. Pretrial
### 1. Motion to Suppress

Before trial, the Defendant's attorney, J. Jeffrey Lee, filed a motion to suppress several videos that the State had recovered from the Defendant's cell phone. At the suppression hearing, the Defendant was represented Mr. Lee. At the hearing, B.B.'s mother, Lavon Redmond, testified that the Defendant was her ex-boyfriend. She said that in June 2011 she and the Defendant were friends but no longer in a romantic relationship. The two had dated for approximately seven years and had lived together for five of those years. Ms. Redmond testified that she received a call from someone in Florida who had found the Defendant's cell phone. The phone identified Ms. Redmond's number as the last person to whom a call from the cell phone was placed. She informed the caller that she did not have an address for the Defendant, and the caller arranged to mail the phone to Ms. Redmond.

Ms. Redmond testified that she called the Defendant and informed him that his phone had been found and that it was being mailed to her. The Defendant insisted that she not look at the phone before she returned it to him. Ms. Redmond said that the Defendant was "so insistent" that it made her curious about what the Defendant did not want her to see. When she received it, she looked through the phone and saw a video of the Defendant caressing B.B.'s bottom with her underwear and pants pulled down. She heard the Defendant ask B.B. if she was uncomfortable.

Ms. Redmond said that, after seeing this video, she called the police and provided them with the Defendant's cell phone.

During cross-examination, Ms. Redmond testified that the Defendant did not want the cell phone mailed to him because he was living in a hotel. She agreed that she told the Defendant that she would not open the phone when she received it, but she opened it despite her promise.

Myron Lawrence, a lieutenant with the Memphis Police Department, testified and confirmed that after he received the Defendant's cell phone he took it into evidence, tagged it, and then obtained a search warrant for the phone. After obtaining the warrant, Lieutenant Lawrence searched the phone and found an image of a man touching a child's buttocks.

2

The Defendant testified that he lost his cell phone on April 10, 2011, while he was in Miami, Florida. He said that, after he realized his cell phone was missing, his friend called the Defendant's cell phone. Whomever answered asked his friend inappropriate questions and would not give back the phone. The person who took his cell phone also posted statuses to his Facebook page speaking ill of the Defendant. The same person also contacted the Defendant's older sister and at least one of the Defendant's friends. The Defendant said that he reported his cell phone stolen and that he purchased a new cell phone.

Two months later, Ms. Redmond, his ex-girlfriend, called him and asked him about some names in his phone, so he knew that she was in possession of the phone. The Defendant said that when Ms. Redmond brought his cell phone to him at the hotel where he stayed, she was accompanied by three police officers. When he opened the door, he was talking on his new cell phone. One of the officers told him to get off the phone; another officer had his gun drawn; and the police took him into custody.

The Defendant testified that when he was in the police car one of the officers showed him his lost cell phone. The officer asked the Defendant about the contents of his phone, and the Defendant made a statement in response to the questioning. The officer placed him under arrest and then went back into his hotel room. In his hotel room, the officers found marijuana.

The Defendant's sister, Lastasia Wilson, testified and confirmed that Ms. Redmond had told her facts that were consistent with Ms. Redmond's trial testimony.

After the hearing, the trial court denied the Defendant's motion to suppress. The trial court found that Ms. Redmond was credible, based in part upon the fact that Ms. Redmond had told Ms. Wilson the same version of events. The trial court found that the fact that Ms. Redmond violated her promise not to look at the phone did not give rise to a Fourth Amendment violation. Further, the trial court found there was no proof that Ms. Redmond was acting as an agent of the State when she obtained or looked at the phone. The trial court found that there was no Fourth Amendment violation, and it denied the Defendant's motion to suppress.

## 2. Pro Se Representation

After the conclusion of the suppression hearing, the Defendant expressed his desire to represent himself. The Defendant said that he had "issues as far as the search warrant" and that he did not think that his attorney, ("Counsel"), was attacking the warrant effectively. The trial court informed the Defendant that it was not a good idea for the Defendant to represent himself. The trial court told him that if Counsel thought

that some motions were not likely meritorious then Counsel likely had a sound justification for that opinion. The Defendant said that, while there had been a motion to suppress the video found on the cell phone, he did not believe that the search warrant itself had been effectively attacked. He said that the search of his phone was not constitutional.

The Defendant further contended that he felt that Counsel was not representing him to the best of his abilities because the Defendant owed Counsel money. The trial court informed the Defendant that Counsel did not have to proceed on a motion that Counsel did not think was valid. The trial court offered the Defendant the opportunity to hire new counsel. The Defendant told the trial court that he wanted to proceed pro se.

The trial court then questioned the Defendant in an effort to determine whether he could effectively represent himself. Upon questioning, the Defendant said that he had never studied the law and had never represented himself or any other defendant in a criminal action. The Defendant said that he understood that he had been charged with two Class B felonies that carried a range of punishment between eight and thirty years. The trial court ensured that the Defendant understood that he could be sentenced consecutively depending on his background and the presentence report. The trial court also ensured that the Defendant understood that the trial court would not advise the Defendant about how to try his case should the Defendant proceed pro se. The Defendant said that he was familiar with the rules of evidence and acknowledged that he would be required to follow the requirements of those rules. The trial court informed the Defendant that it felt that he would be better represented by an attorney, and the Defendant said he understood.

Based upon the Defendant's answers, the trial court found that the Defendant could represent himself, and it appointed Counsel as a standby counsel.

### 3. Motion Hearing

The Defendant filed a motion to suppress the evidence found on his phone. At the hearing on the motion the trial court informed the Defendant that he had not supplied the necessary documentation to support his motion. The Defendant asked about his Fifth Amendment right to not incriminate himself with the statements he made that officers used to support the search warrant. The trial court informed the Defendant that the Fifth Amendment was not relevant to the search warrant. It further stated that the trial court had ruled on the motion to suppress in favor of the State, accrediting the testimony of the State's witnesses. The trial court found that the Defendant had not laid an adequate foundation for his motion, and it denied the motion. The Defendant informed the trial court that his motion was actually about the statements he gave to police.

4

The trial court turned to address the Defendant's motion to suppress his statements to police. The court noted that, after police had seen the videos and engaged the Defendant at the hotel, the Defendant told officers that he did make the videos but that he did so to prove to Ms. Redmond that he was not doing anything wrong. The Defendant told the trial court that, when he gave his statement to police, he was in custody, had not been given *Miranda* warnings, and had recently had a weapon aimed at him by police. The trial court granted the Defendant's request for a hearing.

At the suppression hearing on the Defendant's statements to the police, Officer Jermaine Simpson, with the Memphis Police Department, testified that he was dispatched to a complaint that came from Ms. Redmond's address. Upon arriving, he spoke with her, and she informed him that the Defendant's phone had been mailed to her address. She said that she had gone through the phone and had found a video of the Defendant massaging her nude, minor daughter. Ms. Redmond showed the officer the video and told him where to find the Defendant.

Officer Simpson testified that he and other officers accompanied Ms. Redmond to the hotel where the Defendant was staying. She knocked on the door, the Defendant opened the door, and the Defendant invited the officers inside to speak with him. Officer Simpson said that no officer had a weapon drawn at this time and that he was dressed in his police uniform.

Officer Simpson said that he entered the hotel room and informed the Defendant that the police had been called about a video on his phone that had been mailed to Ms. Redmond. The officer told the Defendant that a face of the man massaging could not be seen on the video and that only a voice could be heard. The voice repeatedly asked B.B. if he was hurting her. The Defendant admitted that it was his voice on the video recording. He explained that he was coaching the victim in basketball and that, after practice, her muscles were sore, so he removed her pants to massage the sore area.

Officer Simpson said that, after speaking with the Defendant in his hotel room, he placed the Defendant in a police car. He noted that, beside the bed in the hotel room, there was marijuana and drug paraphernalia. Officers arrested the Defendant for the marijuana. They created a memo of what had happened and tagged the phone and turned it into property and evidence.

During cross-examination by the Defendant, Officer Simpson testified that the Defendant was not taken into custody when officers first arrived at the hotel. He noted that, because the Defendant's face could not be seen on the video, they spoke with him to get his side of the story. Officer Simpson agreed that, at the time the Defendant made his

5

statements he was not free to leave. He said that the Defendant was, however, only "detained" and not "in custody." The Defendant accused Officer Simpson of lying.

At this point, the trial court informed the Defendant that he could not represent himself. The following exchange then occurred between the trial court and the Defendant:

> [THE TRIAL COURT:] All right. Look, here's what we're going to do. At this point in time I'm going to be real honest with you. You can't handle this. It's too personal. You want to interject yourself saying this is not true. It's not proper in front of a jury. I'm not going to let you represent yourself. I'm going to let [Counsel] represent you.
>
> . . . .
>
> And all you're going to do is you're going to make a mess of things.
>
> THE DEFENDANT: I don't want to make a mess of things. . . . I'm just saying [the officer is] making a mess of things because he's not telling the truth.
>
> THE COURT: Well here's the thing. [Counsel] is going to be your attorney. You cannot handle this obviously because it's too emotional and too close, you understand me? And you can't get up there and tell the jury while you're questioning a witness he's not telling the truth. That's not proper. A lawyer can't do that. You're not a witness. You're asking questions. But you're making yourself a witness.
>
> THE DEFENDANT: Your Honor, may I say something? The jury is not here and I'm just talking to you, Your Honor.
>
> THE COURT: I know that. But I'm just looking at how you're acting.
>
> THE DEFENDANT: I'm talking to you but you heard Ms. Redmond say she was there and she came and knocked on the door in the suppression hearing and you credit her testimony.
>
> THE COURT: Here's what we're going to do. I'm going to let your lawyer, I'm going to let – [Counsel], you're now going to be handling this matter.

6

[Defendant], just have a seat.  Discuss this with your attorney and I'll let him ask the questions.  He knows what's pertinent and what's allowable.  Have a seat, sir.

Do you want a minute, [Counsel]?

Counsel then further cross-examined Officer Simpson.  Officer Simpson said that the hotel room in which the Defendant was staying was small.  He and another officer were inside the room, and two other officers were in the doorway.  He said that he spoke with the Defendant inside the room for approximately ten minutes, during which time the Defendant made the statements about why he had taken the video recording.  The officer then asked the Defendant if he would pull down his own daughter's clothing and massage her bare bottom, and the Defendant responded that he would not.  Officer Simpson agreed that he did not have a warrant for the Defendant's arrest.  The Defendant was taken to a police car, and Officer Simpson showed him the video.  Officer Simpson said that, at one point, he asked the Defendant if the Defendant had a daughter, and the Defendant responded, "Yes."

During argument, the State informed the trial court that it was not seeking to admit into evidence any statements made by the Defendant while he was in the police car.

The trial court ruled that the Defendant's statements made in the car were not admissible.  The trial court found that the Defendant was not "in custody" with regard to the statements he made in the hotel room and that those statements were admissible.

## B. Trial

Ms. Redmond testified that the victim in this case was her daughter, B.B.  Ms. Redmond recalled that she had dated the Defendant for six or seven years.  The Defendant and Ms. Redmond began dating when B.B. was seven years old.  Ms. Redmond and the victim lived in a house with the Defendant for almost three years.  The three then moved to an apartment when the victim was ten years old, and Ms. Redmond and the victim left the apartment to live apart from the Defendant when the victim was about twelve-and-a-half years old.

Ms. Redmond said that the victim and the Defendant had a "pretty close relationship."  She said the Defendant took the victim to play basketball and to parks.  Ms. Redmond said that playing basketball was the most important thing in the victim's life, and she said that the victim still played basketball at the time of trial.  Ms. Redmond said that the Defendant participated in the victim's interest in basketball.  He was always

at the victim's games, taught her how to dribble, and shoot, and about different exercises. The Defendant also took the victim to the gym to practice.

Ms. Redmond recalled that her relationship with the Defendant ended in February 2011. While the two were no longer a couple, they still spoke frequently and "d[id] things together." The Defendant, she said, still went out of town with her and the victim to basketball tournaments. The Defendant still sometimes took the victim to her practice.

On June 4, 2011, while she was living apart from the Defendant, the Defendant's cell phone was mailed to her. Ms. Redmond explained that the Defendant had lost his phone in Florida and someone found the phone. The person who found the phone called Ms. Redmond because she was the last person to whom a call from the cell phone was placed. During this phone conversation, she agreed to have the Defendant's cell phone returned to her address.

Ms. Redmond said that she contacted the Defendant and told him that his cell phone had been found and was being sent to her. The Defendant told her "[s]everal times" not to look at his phone. He told her it was not her phone and not to look at it. He also told her that whatever she found on the phone she "deserve[d]" to find. Ms. Redmond said that, before this conversation, she had no intention of looking at the phone. After the conversation, however, she looked at the phone.

Ms. Redmond testified that, on the Defendant's cell phone, she found a video of the Defendant massaging B.B. with her pants down. She said that he was massaging "all in between [B.B.'s] legs." Ms. Redmond said that after seeing this video she contacted the police.

Ms. Redmond said that she was unaware that the Defendant was giving her daughter "massages" and that he was recording these interactions. She recalled one occasion where she did see the Defendant rubbing the victim's back. She said that they were both fully clothed, so the incident did not draw her concern.

During cross-examination, Ms. Redmond testified that after she and the Defendant broke up he remained a father figure in the victim's life.

Jermaine Simpson, an officer with the Memphis Police Department, testified that Ms. Redmond had told him that the Defendant had lost his phone in Miami and that it had been mailed to her. She went through the phone and found a video. When she asked the victim about the video, the victim told her that these interactions had been going on for "quite some time" and that she was afraid to tell Ms. Redmond about it. Officer Simpson said that Ms. Redmond showed him the phone and the video, and she told him that she

8

recognized the Defendant's voice as being the one heard throughout the video asking the victim if he was hurting her.

Officer Simpson testified that Ms. Redmond told him that the Defendant was staying at the InTown Suites. The officer called his supervisor, who told him to make contact with the Defendant, and the officer asked for backup. Officer Simpson said that, when he knocked on the door of the Defendant's room, the Defendant opened the door. Officer Simpson and his partner entered the room, and two other officers remained outside.

Officer Simpson testified that he asked the Defendant about the video, and the Defendant acknowledged that it was his voice heard on the video. He explained to the officer that he trained the victim in basketball. He said that, after practice, she got sore, so he massaged her buttocks and her hamstrings.

Myron Lawrence, a lieutenant with the Memphis Police Department, testified that, after he received information from Officer Simpson about the evidence on the phone, he obtained a search warrant for the phone. On the Defendant's phone, he found video recordings of a man massaging a child's buttocks. He downloaded the videos, which were entered into evidence.

During cross-examination, Lieutenant Lawrence testified that he found several videos and that they seemed to be from different occasions because the child's panties were different colors.

B.B. testified that she was sixteen years old at the time of trial and that she was in tenth grade in school. She said that she enjoyed playing basketball, a sport that she had played since she was about seven years old. B.B. said that, for basketball, she would practice and also work on her own conditioning herself for the sport. She worked with a trainer at the gym, sometimes running track or lifting weights.

B.B. testified that she first met the Defendant when she was about nine or ten and that he helped her with basketball training for a period of time. The two, she said, had a father-daughter relationship and were "pretty close."

B.B. testified that, when she was about eleven, the Defendant started massaging her "body parts and it made [her] uncomfortable." He massaged her legs and her buttocks. She said that she told the Defendant that she was uncomfortable, and he told her that everything would be "okay" and that he would not hurt her.

9

B.B. recalled the first time that the Defendant massaged her when she was eleven years old. She said that she was lying on the floor of their apartment in Laurelwood Apartments. He touched her legs and thighs over her clothing. After a while, the Defendant started massaging her under her clothes, then he pulled down her shorts, and eventually he pulled her underwear down. B.B. said that the Defendant also massaged the tops of her thighs, her shoulders, her breasts, and the tip of her vagina. B.B. testified that, at first, the Defendant used two hands to massage her. Later, he began using one hand. B.B. said that she saw that the Defendant had his phone in his hand, and he told her that he was texting. B.B. said she was unaware that he was recording the massages.

B.B. testified that the massages continued despite the fact that she told the Defendant she was uncomfortable. They occurred a "few times a week" and after every practice. B.B. said that her mother was not present during the massages and was usually in her room asleep.

B.B. said that she moved with the Defendant and her mother to The Windsor Place apartments when she was twelve and that the massages continued while they lived there. After the Defendant and her mother ended their relationship when B.B. was twelve, the Defendant was still involved in her life. He would pick her up from school some days, when her mother had to work. On these occasions, B.B. would go to the Defendant's hotel room, where the two would work out using a weight bench the Defendant had in his room. The Defendant would then give her a massage. B.B. recalled that, one time, the Defendant told her that he was going to use a remote control to massage her. She said that the object he touched her with did not feel like a remote control. B.B. said that, during almost every massage, the Defendant touched the tip of her vagina with his thumb when he was massaging her between her thighs.

B.B. was shown the DVD of the videos of the massage. She recognized herself and her clothing, and she said that it was the Defendant who was massaging her. B.B. recalled that, after her mother received the Defendant's phone, she asked B.B. about the video. Her mother then called the police.

During cross-examination, B.B. testified that the Defendant trained her in basketball, helping her work out and playing against her. He attended her games and cheered for her. B.B. agreed that the massages were conducted so that she would not be as sore and that her mom was in the next room when many of the massages occurred. She agreed that she could have called out to her mother, and she did not tell the Defendant to stop.

B.B. said her mother knew about the massages at first, but Ms. Redmond told the Defendant not to touch B.B. inappropriately. B.B. said that she trusted the Defendant.

10

She said that the Defendant asked her if she was okay during the massages and that she told him "yes."

During redirect examination she said that she was not okay during the massages but she did not think that the Defendant was doing anything to hurt her. She thought he was trying to help her. She testified that it made her uncomfortable when the Defendant touched her private areas.

Wilton Cleveland, a supervisor for the Memphis Police Department Sex Crimes Bureau, introduced the video recordings taken from the Defendant's cell phone. The videos were shown to the jury. The first video, created January 16, 2011, at 7:31 p.m. was less than a minute in length and showed a weight bench and then the Defendant briefly appears in the frame. Most of the video was of the ceiling or a blank screen. The second video, created January 16, 2011, at 7:36 p.m. lasted less than two minutes and showed the Defendant's bed and the Defendant intermittently. It was apparent that a television in the room was on. Most of the video showed a blank screen.

The third video, created January 29, 2011, at 7:55 p.m., was a seventeen minute video, and it showed the Defendant briefly and then depicted the ceiling for several minutes. About ten minutes into the video, B.B.'s buttocks appeared clothed in pink-edged underwear. The underwear was pulled up to expose much of B.B.'s buttocks. The Defendant's hand was massaging B.B.'s buttocks. The Defendant's thumb traveled close to the area between B.B's legs. The camera zoomed in on the area between B.B.'s legs while the Defendant's hand massaged her buttocks. The screen went blank and stayed blank for the duration of the video. The fourth video, created January 29, 2011, at 8:02 p.m. lasted approximately four minutes. B.B.'s buttocks appeared in the same pink-edged underwear and the underwear was again pulled up. The Defendant's hand was massaging the buttocks, and he slipped his hand under her underwear. The screen went blank for a minute, and then B.B.'s buttocks was seen with the underwear pulled below her bottom. The Defendant's hand massaged the buttocks for several minutes while the video was being recorded. His thumb again went near the area between her legs.

Lieutenant Cleveland agreed that many of the videos on the Defendant's phone were of irrelevant activity: monster truck races or other events. Skipping forward, the State showed the jury a video created on February 20, 2011, at 8:57 p.m. In the video, there were several minutes that showed the ceiling or wall. Around seven-and-a-half minutes into the video, B.B.'s buttocks in blue underwear was visible. The underwear was pulled up to expose much of her buttocks. The Defendant's hand was seen in the video massaging the buttocks and then slipping below B.B.'s underwear.

11

A video created February 23, 2011, at 1:18 p.m., showed B.B.'s buttocks in white underwear. The Defendant's hand was seen massaging the buttocks and B.B.'s thighs between her legs.

Three videos taken sequentially March 5, 2011, at 10:00 a.m., showed the Defendant's hand massaging B.B.'s buttocks. B.B. wore white underwear that were pulled up to expose much of her buttocks. The video went blank for several minutes and then showed B.B.'s underwear pulled below her buttocks, exposing her entire buttocks. The Defendant's hand was seen massaging the bare female buttocks. Much of the video recording was blank. Intermittently, the Defendant's hand can be seen massaging B.B.'s buttocks and between her thighs.

Videos created on March 11, 2011, at 6:42 a.m., showed the Defendant's hand massaging B.B.'s buttocks. B.B. was wearing blue-edged underwear pulled up to expose her buttocks. Her white jeans are pulled down, exposing her buttocks and tops of her thighs. The Defendant's hand was seen massaging B.B.'s buttocks, and his hand slipped under her underwear. The video went blank and then B.B.'s buttocks appeared unclothed, with her underwear pulled below her buttocks. The Defendant's hand continued to massage. The video again went blank for several minutes. B.B.'s bottom then appeared in view, and it was clothed again in underwear with the Defendant's hand massaging it. The video again went blank, and then on the screen appeared a female lying face down on a bed, her bottom clothed in underwear.

A video created April 3, 2011, at 6:17 p.m., showed the Defendant wearing a whistle around his neck. B.B. was lying on a bed in what appeared to be work-out clothing. The Defendant began massaging her legs over her clothing. The Defendant then pulled down B.B.'s shorts, exposing her white underwear. The Defendant continued his massage. The Defendant was seen massaging B.B.'s buttocks and between her thighs while B.B. was still clothed in underwear. The Defendant took the phone in one hand and brought the camera closer to B.B.'s buttocks, massaging B.B. with his other hand. B.B.'s underwear was pulled up exposing her buttocks. The Defendant placed the phone back down and began massaging B.B. with both his hands, sliding them under her underwear. He also massaged B.B. between her legs. The Defendant then pulled down B.B.'s underwear and massaged her bare buttocks. The Defendant then pulled B.B.'s underwear back up over her buttocks. He massaged her again between her legs in a rhythmic manner. At one point, B.B. raised her hips, and the Defendant's hands went further between her legs, continuing his rhythmic massage. Later in the video, the Defendant pulled down B.B.'s underwear and continued to massage her between her legs.

During cross-examination, Lieutenant Cleveland agreed that the videos appeared to have been recorded while the lights and television were both on. The female in the

video was partially clothed and the male depicted appeared to be fully clothed in some sort of athletic clothing. During redirect examination, Lieutenant Cleveland testified that during a number of frames of the video the buttocks that appeared were unclothed or covered only in underwear.

The Defendant testified that he and Ms. Redmond had dated for five or six years. He viewed B.B. as a stepdaughter, and he helped her with basketball and to get into a private school. The Defendant said he taught B.B. to shoot the ball, dribble the ball, and how to be better-conditioned than her peers. The Defendant described himself as an "awesome trainer" and said that he had B.B. doing squats, running miles, leaping over fences, and doing push-ups. The Defendant said that he took B.B. to practice and attended her basketball games. The Defendant felt proud of B.B. and the promise that she showed for basketball.

The Defendant testified that the videos showed him giving B.B. massages. He said that she would complain about pain in her legs, so he massaged her to try to loosen "everything up." The Defendant said that he had B.B. remove her clothing because her clothing was getting in the way. He conceded that "it wasn't really the right thing to do" but that he did not have "any kind of sexual intent" during the massage. The Defendant said that he never forcefully removed B.B.'s clothing and that the decision to remove her clothing was "mutual." The Defendant said that the videos showed him massaging her buttocks primarily because, when she did squats, her pain was primarily in her hips, buttocks, and thighs.

The Defendant testified that he video-recorded the massage sessions to document that he was not inappropriate. He maintained that the videos were not sexual in nature and said that he did not view B.B. in a sexual way. The Defendant agreed that one of the videos showed B.B. wearing jeans. He said that B.B. would sometimes wear jeans over her work out shorts. The Defendant said that he sometimes massaged B.B. with one hand and sometimes with two hands. He said that, when he massaged her with one hand, he was holding the phone with the other hand. He said that he was never touching himself while massaging B.B. He said that he was never aroused and reiterated that the massages were not sexual.

During cross-examination, the Defendant agreed that he was like a father to B.B. He said that he supported her love for basketball and taught her different things. He said that he started these massages when B.B. was eleven or twelve years old. The Defendant agreed that there were no videos of B.B. doing pushups or squats, but he said that he took them and the recordings were on his phone. The Defendant said that he did not tell B.B. or Ms. Redmond that he was taking videos of B.B.'s bare bottom, and he did not show either of them the videos. The Defendant said that he did not want Ms. Redmond to see

the videos. The Defendant said that, while unclothing was a "mutual" decision, he was the one who pulled down B.B.'s pants before he gave her a massage. He maintained that he only took the videos to prove he was doing nothing wrong.

On redirect examination, the Defendant testified that he did not want Ms. Redmond to look through his phone because there were text messages between "female friends" and him. He said that, while the two were not in an exclusive relationship, he did not want her aware that there were other women who were texting him. The Defendant said that if B.B. had ever indicated that she was uncomfortable or asked him to stop massaging her that he would have stopped.

The State elected facts to support the charges. The trial court informed the jury that to support the aggravated sexual battery charge, the State elected the offense described by the Defendant's alleged pulling down the victim's pants and underwear and touching her buttocks and vagina, skin to skin, for the first time, which occurred in 2009, when the victim was twelve years old and living at Laurelwood Apartments. The trial court informed the jury that to support the aggravated sexual exploitation of a minor charge, the State had elected the video dated January 29, 2011, at 8:02 p.m., which showed the Defendant touching the buttocks of the victim while she was wearing pink patterned underwear and again when her panties were pulled below her bottom. Based upon this election and this evidence, the jury found the Defendant guilty of aggravated sexual battery and especially aggravated sexual exploitation of a minor.

## C. Sentencing

At the sentencing hearing, the trial court stated that the State had filed a notice of enhancement factors and also a motion for consecutive sentencing. The State presented the presentence report and no other evidence. The Defendant chose to make a statement rather than be questioned by his attorney. In his statement, the Defendant expressed the belief that he had been forgiven by God for his crime. He then said that he had not received a fair trial because he was convicted based upon the "perjury testimony" from a policeman. He expressed his desire to get a good attorney on appeal so the appellate judges could "exonerate [him]."

The Defendant noted that Ms. Redmond and B.B. were both not present at the hearing, so he could not ask them for forgiveness for any wrong that they thought he had done. He said that he believed B.B. would be successful because of the basketball coaching he had provided to her.

The parties presented arguments after which the State informed the trial court that a sample of the Defendant's DNA sample, obtained upon his arrest, had been submitted

14

to CODIS, and there was a match to the Defendant for a home invasion and rape that occurred in 2010. The State said that it had submitted that evidence for indictment.

The trial court found that the Defendant was a Range I offender. For the aggravated sexual battery conviction, a Class B felony, he was subject to a punishment of between eight to twelve years. The trial court found that enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range applied based upon the Defendant's two prior convictions for misdemeanor drugs as well as some driving offenses and also a failure to appear conviction. T.C.A. § 40-35-114 (1) (2014). The trial court found that enhancement factor (14) applied, that the Defendant abused a position of public or private trust that significantly facilitated the commission of an element of the offense. T.C.A. § 40-35-114 (14). The trial court noted that the victim was a minor child and was in the Defendant's custody and control during the commission of these offenses.

In mitigation, the trial court found that mitigating factor (1) applied because the Defendant's conduct neither caused nor threatened serious bodily injury. T.C.A. § 40-35-113 (1) (2014). The trial court also took into account that the Defendant had strong family support pursuant to mitigating factor (13). T.C.A. § 40-35-113 (13).

The trial court stated:

As to count one, the Court finds that based on the testimony in this case, the proof that was adduced, which the Court before sentencing has reviewed the Court's notes as to the testimony at the trial, as well as considering the memorandums filed by the defense and the presentence report, which has been considered in full, regarding the [D]efendant's background.

The Court finds that this case involved a number of incidents that were mentioned in the indictment, as well as were testified to, at trial.

There was an elected offense, which the jury found beyond a reasonable doubt was proven by the State, which was the conviction offense for aggravated sexual battery.

However, the testimony was such that this conduct clearly persisted over a number of years, ending at such time after the victim turned thirteen, but was then being video-taped by the [D]efendant.

15

The Court finds that based on that, the proper sentence in this case would be twelve years.

As to the other count, which is aggravated sexual exploitation of a minor, this dealt with the [D]efendant filming the victim. The filming was proven at trial, as well as the videos, which were presented to the jury.

The Court finds that under the circumstances, especially that this occurred towards the end of the criminal episode the Court will sentence the [D]efendant to nine years on this offense, at the Department of Correction.

The trial court then addressed consecutive sentencing. It stated:

That the [D]efendant is convicted of two, or more statutory offenses involving sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between the [D]efendant and the victim, or victims;

The time span of the [D]efendant[']s undertaking in sexual activity. The nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim, or victims.

The Court is considering that consecutive sentencing factor. In this particular case we have a long history of several years, several locations. The fact that the relationship, again, between the [D]efendant and the victim, the victim trusted the [D]efendant, the [D]efendant was helping the victim in coaching and trying to help the victim with her basketball, that she was very, very interested in and apparently was very successful at. The [D]efendant used that relationship to commit these offenses for many years.

The scope of the sexual acts, again, this was a very regular and ongoing thing and the Court, based on the testimony of the victim finds that there was residual damage, though it was not physical, it was mental and feels that consecutive sentencing would be appropriate in this case, considering all of the factors that are set out.

For that reason, count one will be served and count two will be served, consecutively, to count one.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it required that he be represented by counsel at trial; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court erred when it ordered consecutive sentences.

### A. Self-Representation

The Defendant contends that the trial court improperly denied him his right to self-representation. He contends that the trial court based its decision on the fact that he improperly impeached a witness and because he was "too emotional" about the subject matter. He asserts that these were not proper bases for the trial court's decision. The State counters that the trial court properly reappointed the Defendant counsel after the Defendant repeatedly demonstrated that he was too emotionally charged to conduct himself within the constraints of proper courtroom decorum.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Constitution of Tennessee guarantee the accused a right to the assistance of counsel. *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009). Likewise, the accused has a right to self-representation. *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). The right to self-representation and right to counsel are rights in the alternative, and the defendant cannot, for obvious reasons, assert both at the same time. *Lovin*, 286 S.W.3d at 284. "The determination of whether a defendant has exercised his or her right of self-representation and has concurrently waived his or her right to counsel is a mixed question of law and fact." *State v. Hester*, 324 S.W.3d 1, 29 (Tenn. 2010) (citing *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990); *Spencer v. Ault*, 941 F. Supp. 832, 851 (N. D. Iowa 1996); *State v. Jordan*, 118 Conn. App. 628, 984 A.2d 1160, 1166 (2009); 1 Kevin F. O'Malley et al., Federal Jury Practice & Instructions § 5:6 (6th ed.2009)). Accordingly, on appeal, we apply a de novo standard of review, granting the trial court the presumption that its findings of fact are correct. *Id.* at 29-30 (citing *State v. Holmes*, 302 S.W.3d 831, 837 (Tenn. 2010)). An error in denying the right to exercise self-representation is a structural constitutional error that is not subject to harmless error review and requires automatic reversal. *Id.* at 30 (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)); *see also State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (holding that "[t]he accused is not required to establish prejudice when his right to self-representation has been wrongfully denied").

"When balancing the right of self-representation against the right to counsel at the trial stage of proceedings, the courts have assigned a constitutional primacy to the right to

counsel over the right to self-representation." *Helster*, 324 S.W.3d at 30. Thus, "courts should indulge every presumption against waiver of the right to counsel." *Id.*

For a defendant to exercise his or her right of self-representation at the trial stage of the proceedings, (1) a defendant must make the request in a timely manner, (2) the assertion of the right of self-representation must be clear and unequivocal, and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel. *Id.* at 30-31 (citations omitted). In accordance with Tennessee Rule of Criminal Procedure 44(b)(1)(A), before accepting a defendant's waiver of the right to counsel, the trial court must "advise the accused in open court of the right to the aid of counsel at every stage of the proceedings." *Id.* at 30. The Court must also "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." *Id.* (quoting Tenn. R.Crim. P. 44(b)(1)(B)). The defendant must waive his or her right to counsel in writing, Tennessee Rule Criminal Procedure 44(b)(2), and this writing must be included in the record, Tennessee Rule Criminal Procedure 44(b)(3).

Even where the invocation of the right of self-representation meets these requirements, the effectiveness of the defendant's invocation and waiver is not necessarily a foregone conclusion. *Id.* The right of self-representation is not absolute. *Id.* (citing *Indiana v. Edwards*, 554 U.S. 164, 171 (2008)). Among other limitations, the United States Supreme Court has recognized the absence of a right of self-representation when a defendant seeks to abuse the dignity of the courtroom or to engage in serious obstructionist misconduct. *Id.* (citing *Edwards*, 554 U.S. at 171). Defendants are "not entitled to use the right of self-representation as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process." *Id.* (citations omitted).

In the case under submission, after the hearing on the motion to suppress, the Defendant requested that he be allowed to represent himself. He claimed that Counsel was not effectively representing him because he owed Counsel money. The trial court questioned the Defendant, warned the Defendant against self-representation, and allowed the Defendant to represent himself, appointing Counsel as "advisory counsel." The Defendant then filed several motions, again attacking the evidence obtained by police. The trial court informed the Defendant that his motions were not properly prepared. After speaking with the Defendant for some time, the trial court explained that it had ruled on the motion to suppress and that it had credited the testimony of the officers. After further argument by the Defendant, the trial court allowed the Defendant to have a hearing on the limited issue of whether he was in custody while he gave statements to police.

During the hearing on that issue, the Defendant attempted to relitigate issues already decided by the trial court. The Defendant then openly accused the police officer of lying. When the trial court reminded the Defendant that he had already credited the officer's testimony, the Defendant then again accused the officer of lying. At this point, the trial court noted that the Defendant was "too emotional" to handle representing himself. At the hearing on the motion for new trial, the trial court stated:

> During the motion to suppress the [D]efendant, you know . . . was very emotional and got into an argument with the witness and started making statements.

> As I told him the first time I admonished him is that you're not allowed to do this in front of a jury. It wasn't a jury in the box at that time, it was a hearing before the Court, but he kept saying oh, the witness is lying. He just kept – he would stop and say, Judge, he's lying.

> And as I told him I said you can't do that. And it got to the point where it was constant and I finally said to him, I said this is too emotional for you. And I said I think I'm going to go ahead and require you to acquire [Counsel] to come on the case, and at that time he indicated he understood the reason that he was emotional and he was having a hard time being able to do that.

> So I went ahead and at that point had [Counsel] come back on. I had him sitting in the courtroom at the time as stand-by counsel, and I went ahead and put him back on the case.

> Based on everything I saw I . . . do not believe that that was an erroneous decision on my part, and I'm going to deny those parts of [the] motion [for new trial].

From our reading of the transcript, it appears that the Defendant's self-representation was disruptive. The Defendant's repeatedly accusing a witness of lying, after being admonished by the trial court, and being unable to accept the trial court's ruling and move forward with the case, show that he was using his representation to disrupt the legal process. The record evinces that the trial court was patient, often repeating instructions to the Defendant, and that it attempted to allow the Defendant to represent himself. We were not present in the courtroom. We did not hear the Defendant's tone or see the Defendant's demeanor when he accused the officer repeatedly of lying. We, therefore, rely on the trial court's assessment that the Defendant could not handle his own representation because he was too emotional about the case and

19

disruptive to the legal process. We conclude that the trial court did not commit constitutional error by denying the Defendant's request to represent himself. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions. He asserts that the evidence does not support his aggravated sexual battery conviction because, as he testified, he had no sexual intent when he touched B.B. The Defendant further contends that the evidence is insufficient to support his conviction for especially aggravated sexual exploitation of a minor because the recordings from his phone do not show the victim engaging in "sexual activity." The State counters that the evidence is sufficient to sustain the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in

favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of one count of aggravated sexual battery and one count of aggravated sexual exploitation of a minor. Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2014). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" T.C.A. § 39-13-501(6) (2014). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" T.C.A. § 39-13-501(2) (2014). "The requirement of a particular purpose, to arouse or gratify sexual desire, distinguishes the crime of sexual battery from an ordinary assault and from noncriminal touching or contact." *State v. Santos Medardo Funes Romero*, No. E2013-02137-CCA-R3-CD, 2014 WL 7010815, at *16 (Tenn. Crim. App., at Knoxville, Dec. 12, 2014) (citing *State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-CD, 2005 WL 623244, at *5 (Tenn. Crim. App., at Knoxville, Mar. 17, 2005), *perm. app. denied* (Tenn. Oct. 10, 2005)), *no Tenn. R. App. P. 11 application filed*. The aggravated sexual battery statute does not require that the defendant become sexually aroused or gratified by the sexual contact, only that the touching can be "'reasonably construed as being for the purpose of sexual arousal or gratification.'" *State v. Mahlon Johnson*, No. W2011-

21

01786-CCA-R3-CD, 2013 WL 501779, at \*12 (Tenn. Crim. App., at Jackson, Feb. 7, 2013) (quoting *State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at \*3 (Tenn. Crim. App., at Nashville, June 3, 2004) sub history), *perm. app. denied* (Tenn. Aug. 14, 2013).

In the case under submission, the evidence shows that the Defendant began massaging B.B. when she was eleven years old. The massages were initially over her clothing, but they eventually occurred against her bare skin with her underwear pulled below her bottom. The Defendant massaged B.B.'s bare buttocks, her inner thighs, and the tip of her vagina. Later, after the victim was older than thirteen, the Defendant began video taping these massages. He zoomed the camera close to her bottom while he rhythmically rubbed her buttocks and between her legs. The jury heard the Defendant's testimony that these massages were non-sexual in nature; however, by their verdict, they did not credit the Defendant's account of the massages. We conclude that this evidence supports the jury's finding that the contact between B.B. and the Defendant was "sexual contact," that the victim was less than thirteen when this contact occurred, and that the touching could be reasonably construed as being for the purpose of sexual arousal or gratification.

Especially aggravated sexual exploitation of a minor occurs when a person knowingly promotes, employs, uses, assists, transports, or permits a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaged in: "(1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." T.C.A. § 39-13-1005 (a) (2014). A minor is defined as "any person who has not reached eighteen (18) years of age." T.C.A. § 39-17-1002 (3). "Material" is defined as:

(A) Any picture, drawing, photograph, undeveloped film or film negative, motion picture film, videocassette tape or other pictorial representation;

(B) Any statue, figure, theatrical production or electrical reproduction;

(C) Any image stored on a computer hard drive, a computer disk of any type, or any other medium designed to store information for later retrieval; or

(D) Any image transmitted to a computer or other electronic media or video screen, by telephone line, cable, satellite transmission, or other method that is capable of further transmission, manipulation, storage or accessing, even if not stored or saved at the time of transmission . . . .

22

T.C.A. § 39-17-1002 (2).  "Patently offensive" means that which goes substantially beyond customary limits of candor in describing or representing such matters.  T.C.A. § 39-17-1002(4).

The State elected facts to support the conviction relying on a video of the Defendant massaging B.B.'s buttocks while she was wearing pink-edged underwear.  The Defendant pulled B.B.'s underwear below her buttocks and video-recorded himself massaging her bare bottom with his thumbs traveling between her legs.  This is sufficient evidence to support the Defendant's conviction.  *See State v. Tolbert Cates Kail*, No. W2011-01474-R3-CD, 2013 WL 2152144, at *1-2, *8-9 (Tenn. Crim. App., at Jackson, May 17, 2013), *perm. app. denied* Tenn. Sept. 10, 2013).  The victim was under eighteen and qualified as a "minor" pursuant to the statutory definition.  The Defendant video-recorded himself massaging the victim in a manner that depicted her engaging in sexual activity.  He is not entitled to relief on this issue.

## C.  Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered that his sentences run consecutively.  He asserts that consecutive sentences were not warranted because he was not convicted of two or more statutory offenses of sexual abuse of a minor and because the aggravating circumstances for imposition of consecutive sentences were not present.  The Defendant bases his first contention upon the fact that B.B. was not a "minor" when he filmed her engaged in sexual activity.  About his second contention, he asserts that there was no evidence that B.B. had any residual physical or mental damage and the nature and scope of his sexual acts does not weigh in favor of consecutive sentences.  The State disagrees, stating that the trial court properly sentenced the Defendant.  We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions.  The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"  *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).  To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision.  *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).  The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record

demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence and consecutive sentencing. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). In *State v. Pollard*, the Court held, "the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." 432 S.W.3d 851, 860 (Tenn. 2013). We also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *Pollard*, 432 S.W.3d at 860. A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115 (b)(1)-(7) (2014). One of those factors is that: "The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims. T.C.A. § 40-35-115 (b)(5). In addition to these criteria, consecutive sentencing is subject to the general

sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102 (1), -103 (2) (2014); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In the case under submission, the trial court based its decision upon the fact that the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the Defendant and victim, the time span of the Defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim. *See* T.C.A. § 40-35-115 (b)(5). The trial court stated:

> The Court is considering that consecutive sentencing factor. In this particular case we have a long history of several years, several locations. The fact that the relationship, again, between the [D]efendant and the victim, the victim trusted the [D]efendant, the [D]efendant was helping the victim in coaching and trying to help the victim with her basketball, that she was very, very interested in and apparently was very successful at. The [D]efendant used that relationship to commit these offenses for many years.
>
> The scope of the sexual acts, again, this was a very regular and ongoing thing and the Court, based on the testimony of the victim finds that there was residual damage, though it was not physical, it was mental and feels that consecutive sentencing would be appropriate in this case, considering all of the factors that are set out.

We conclude that the evidence supports the trial court's findings. The Defendant first contends he was not convicted of two or more offenses involving a minor victim because the victim was not a "minor" in that she was more than thirteen when he video recorded her. We find this argument unpersuasive. The relevant statute defines minor as one under the age of eighteen. While in other contexts a minor may be defined differently, we use the definition provided by the statute relevant to the Defendant's conviction. He was therefore convicted of two or more offenses involving a minor victim.

We further conclude that the trial court did not err when it determined that the factors to be considered by the statute weighed in favor of consecutive sentences. The Defendant's sexual abuse went undetected for years and was only discovered after the Defendant's ex-girlfriend looked through his phone against his wishes. The Defendant abused the victim's trust in him as a father figure and a basketball mentor. The Defendant massaged the victim between her legs starting when she was eleven years old

25

and ending years later. The massages became more intense, as shown by the videos retrieved from the Defendant's cell phone. The trial court heard the victim's testimony at trial and determined that she had residual mental damage. We conclude that the trial court did not err when it ordered that the Defendant serve his sentences consecutively based upon its weighing of the relevant factors. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE